UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS

| | |
|---|---|
| MICHAEL T. GILLARD, | : Case No. 2:24-cv-3695 |
| Petitioner, | : |
| vs. | : District Judge Michael H. Watson |
| | : Magistrate Judge Kimberly A. Jolson |
| WARDEN, BELMONT COUNTY CORRECTIONAL INSTITUTION, | : |
| Respondent. | : |

**REPORT AND RECOMMENDATION**

Petitioner, Michael T. Gillard, a state prisoner, has filed a *pro se* Petition (Doc. 1) and Supplemental Amended Petition (Doc. 8, at PageID 2207), for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the Petition, as amended (Docs. 1, 8); Respondent's Return of Writ (Docs. 5, 11); and Petitioner's Traverse (Docs. 12, 17), in which he requests an evidentiary hearing.  For the reasons that follow, the Undersigned **RECOMMENDS** that the Petition, as amended, be **DENIED** without an evidentiary hearing.

I.  FACTUAL BACKGROUND

On June 17, 2020, the Muskingum County, Ohio, grand jury returned a three-count indictment charging Petitioner with two counts of rape and one count of attempted rape arising from events occurring on June 5, 2020, and relating to fourteen-year-old victim M.G.  (Doc. 4, Ex. 1, PageID 19).  Petitioner, through counsel, entered a plea of not guilty.  (*Id.*, Ex. 2, PageID 21). The case proceeded to a jury trial.

The Ohio Court of Appeals summarized the relevant facts, and, in accordance with 28 U.S.C. § 2254(e)(1), those facts are presumed correct on habeas review:

[*Testimony of M.G., her mom, and her friend*]

{¶5} M.G. testified that Gillard's motorcycle was parked . . . in the driveway. She testified that Gillard asked [her mom] if he could take M.G. and [her friend] shopping to get clothes for school. Gillard then asked M.G. if she would like to go for a ride on his motorcycle. At first M.G. did not want to go; however, after teasing from [her friend] and [her mom] she acquiesced in what she thought was to be a short ride around the block. M.G. gave her cell phone to [her friend] for safekeeping and left on the motorcycle with Gillard.

{¶6} Instead of going around the nearby stadium, Gillard drove to his mother's house. M.G. testified that Gillard entered the residence to grab a beer and a cigarette, and M.G. followed him into the house. They remained in the kitchen between five and ten minutes. They then moved onto the porch where M.G. attempted to perform a "beer trick" by removing the cap of a glass bottle using a knife. After that, M.G. and Gillard returned to the residence and sat on the couch in the living room, where they talked for another five to ten minutes. M.G. testified that Gillard then asked for a back rub. Gillard then removed M.G.'s tank top while fondling her breasts, eventually removing her bra as well. Gillard then began to try to remove M.G.'s pants. He was able to remove one of M.G.'s legs from her pants, as M.G. was shoving him away, eventually falling to the floor. Once on the floor, Gillard "stuck his dick inside" of M.G.'s vagina. Gillard was moving back and forth. M.G. testified that Gillard forced his penis in her mouth after asking her to kiss it. M.G. testified that Gillard's mouth also came in contact with her vagina. She further testified that Gillard placed both his hands and mouth on her exposed breasts.

{¶7} M.G. attempted to scoot away while on her back on the floor, telling Gillard that she was only fourteen years old. As a result, M.G. received a rug burn on her back from the carpeting.

{¶8} M.G. testified that Gillard got dressed and acted as if nothing had happened. He asked M.G. if she wanted to drive his car back to her grandmother's house, which she did. On the way, Gillard was touching M.G.'s thigh. Gillard gave M.G. his black Cash App card and a gold bracelet, which, at the time M.G. mistook for a watch. Gillard told M.G. he would put money on the card, if she did not tell anyone what had happened.

{¶9} After returning to her grandparent[s'] residence, M.G. testified that she ran straight to her bedroom. In her bedroom she showed [her friend] the rug burn, the black Cash App card and the bracelet. M.G. was crying, shaking and visibly distressed. [Her friend] testified that M.G. told her that she received the rug burn while trying to get away, but Gillard dragged her across the carpet. M.G. testified that she did not tell [her friend] how she sustained the rug burn.

{¶10} [M.G.'s mom] testified that she asked the girls to go to a nearby dollar store with her and they agreed to go. [M.G.'s mom] went inside the store and the girls remained in the car. A friend came into the store to ask what was wrong with M.G., prompting [her mom] to immediately leave and return to the car. [M.G.'s friend] told M.G. if she did not say something to her mother then she . . . would. M.G. told her mother that Gillard had "hurt her." Enraged, [her mom] "flew down the road" to confront Gillard. En route, she called 9-1-1.

### *Gillard's arrest and interview*

{¶11} Deputy Graham Schaumleffel formerly of the Muskingum County Sheriff's Office testified that on June 5, 202[0], he was flagged down by a woman, later identified as [M.G.'s mom], in a car who told him that she had called 9-1-1. This encounter was only a couple hundred feet from [the mom's] home. Deputy Schaumleffel interviewed [M.G.'s mom] at her home, where she gave him the black Cash App card and bracelet that M.G. had given to her. The lights to the deputy's sheriff's cruiser remained flashing during this time. M.G. and her mother pointed to Gillard as they saw his motorcycle stop at the top of a nearby hill. [M.G.'s sister] got off of the back of the motorcycle and ran down the hill to the home. The motorcycle took off. Deputy Hamilton made the initial stop with Deputy Schaumleffel arriving shortly thereafter.

{¶12} Deputy Brandon Hamilton testified that he initiated a traffic stop of Gillard. Gillard volunteered to Deputy Hamilton that he, Gillard, had crazy sex with [M.G.'s sister] and that they each urinated on each other. Deputy Hamilton collected DNA samples from Gillard's finger's and penis at the sheriff's office.

{¶13} Detective Brad Shawger obtained a waiver from Gillard of his *Miranda* rights. The interview was recorded and played for the jury. Gillard went into detail about his sexual relations with [M.G.'s sister]. Gillard told the detective that [M.G.'s sister] had taken his black Cash App card. Gillard claimed the only person that he had sex with was [M.G.'s sister]. Gillard claimed M.G. had never been to his mother's home and that he had never had sex with her. Detective Shawger testified that he interviewed [M.G.'s sister] and that she denied having sex with Gillard on June 5, 2020. [M.G.'s sister's] blue and white underwear was found on the living room couch during a consensual search of Gillard's mother's home.

{¶14} [M.G.'s sister] testified that she did not have sex with Gillard on June 5, 2020. She further testified that her blue and white underwear were not left there on that day, but from another time. . . . She testified that she got off of Gillard's motorcycle at the top of the hill because they could see the police were at the home of her mother. She testified that the motorcycle did not break down when she was with Gillard.

### *Forensic interview*

{¶15} M.G. was taken to Nationwide Children's Hospital in Columbus. Jamie Casto, a forensic interviewer interviewed M.G. The video of the interview was played for the jury without objection. M.G.'s account of the events was similar to her testimony at trial. The only difference being that M.G. told Ms. Casto that she had not seen Gillard in three years and that Gillard was a friend of her deceased step-father.

{¶16} Logan Stover, the Sexual Abuse Nurse Examiner (S.A.N.E.) testified that she found nothing abnormal, even with the colposcope observation, in her examination of M.G. She observed no abrasions, redness, bruising or swelling in the vagina of M.G. M.G. told Ms. Stover that Gillard had put his fingers and his penis inside her vagina. Pictures of the abrasion on M.G.'s back were admitted into evidence.

### *Gillard testifies at trial*

{¶17} Gillard testified that, while he was socializing at [M.G.'s mom's] house, he smoked some "meth" with [another guest] who was at the home. In his words, he "[d]id a couple hits on a bubble." [M.G.'s mom] asked Gillard if he had any meth, to which he responded no. M.G. and [her friend] walked out at this time. M.G. commented on how she liked his motorcycle and asked to be taken on a ride. He agreed. Gillard specifically denied offering to take M.G. shopping for clothes. He testified that, after [M.G.'s mom] remarked that M.G. needed clothing for school, Gillard responded, "I [have] my own kids to take care of."

{¶18} While taking M.G. for a ride, Gillard noticed that his motorcycle was "stalling out." As such, he drove to his mother's residence to exchange the motorcycle for his car. While at his mother's residence, Gillard went inside the house to get a cigarette and a couple beers. M.G. remained outside on the wooded deck area attached to the house.

{¶19} Gillard had to enter the car through the passenger side and open it for M.G., because the driver side door was broken. After M.G. got in, she claimed that she could not locate her phone and asked Gillard to call it for her. Gillard walked back to the deck to look for the phone but was unable to locate it. He returned to the car and M.G. drove them back to the Oakland Avenue residence.

{¶20} Upon their arrival, Gillard apologized for his motorcycle malfunctioning and M.G. exited the vehicle. Gillard then continued to wait at the Oakland Avenue residence for [M.G.'s sister], who, according to J.G. was on her way. Approximately five minutes later, [M.G.'s sister] arrived in a Dodge Ram truck, approached Gillard's vehicle, and they agreed to drive back to his mother's residence to have sex.

4

{¶21} As Gillard was driving, [M.G.'s sister] began performing oral sex on him, which continued after they entered the living room of the Ridge Road residence. Eventually, they moved to the floor in front of the couch, engaged in vaginal intercourse and urinated on each other. Gillard removed his underwear and threw them down the stairwell leading to the basement. Before leaving to return to the Oakland Avenue address, Gillard reminded [M.G.'s sister] to grab her purse and blue underwear, which were both laying on the couch. [M.G.'s sister's] underwear remained on the couch and were later discovered by law enforcement during its investigation. After Gillard replaced the battery to his motorcycle, he and [M.G.'s sister] rode back to the Oakland Avenue residence.

{¶22} Gillard testified he dropped [M.G.'s sister] off at the top of the hill because she expressed concerns that she was in trouble for stealing her boyfriend's truck. Shortly thereafter, law enforcement initiated a traffic stop of Gillard's motorcycle and notified him that he was "under investigation for a sexual assault with a minor."

{¶23} Gillard admitted that he lied to Detective Shawger during his interview about the events. He admitted that he did not tell the police at first about M.G. going for a ride on the back of his motorcycle. Gillard claimed that he lied because Detective Shawger told him that, "I don't care what color you are." Gillard lied to the police because he did not want to "get signed off for something I didn't do."

### *DNA Evidence*

{¶24} Some of the samples collected by law enforcement were tested by the Bureau of Criminal Investigation for DNA. The tested samples include those taken from M.G.'s breasts, vagina, and underwear, as well as the standard provided by Gillard. Other items, which included, pubic hair, neck, thigh, and fingernail swabs from M.G., and an oral swab from [M.G.'s sister] were not tested. The wet spot on the carpet in Gillard's mother's home and neither set of soiled underwear were tested. None of the tested samples revealed the presence of sperm. Moreover, none of the tested samples definitively revealed the presence of Gillard's DNA on M.G. Similarly, M.G.'s DNA could not be excluded from Gillard's penile swab, as it contained a mixture of DNA. At most, Y-STR testing from M.G.'s breast and vaginal samples revealed the presence of a male DNA profile from which Gillard could not be identified, but could also not be excluded.

(Doc. 4, Ex. 29, at PageID 248–55) (footnotes and state-appellate-court record cites omitted) (heading added).

On April 14, 2022, Petitioner was found guilty on all three counts. (*Id*., Ex. 23, PageID 181). Thereafter, on May 31, 2022, Petitioner was adjudicated a Tier III sex offender and, on June

3, 2022, was sentenced to an aggregate prison term of 10 to 15 years in the Ohio Department of Corrections. (*Id.*, Ex. 24, PageID 182).

## II. Procedural Background

The Court next summarizes the subsequent procedural history.

### A. Direct Appeal

On June 21, 2022, Petitioner, through counsel, filed a timely notice of appeal to the Ohio Court of Appeals. (*Id.*, Ex. 25, PageID 185). Petitioner, through new counsel, raised the following two assignments of error in his merits brief:

1. Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States constitution and comparable provisions of the Ohio Constitution.

2. The trial court erred by permitting the introduction of evidence related to Appellant's irrelevant prior bad conduct for the impermissible purpose to prove Appellant's propensity to commit criminal acts in violation of the Ohio Rules of Evidence and his rights as guaranteed by the United States and Ohio Constitutions.

(*Id.*, Ex. 26, at PageID 199). On August 2, 2023, the Ohio Court of Appeals issued an opinion overruling both assignments of error and affirming the trial court's judgment. (*Id.*, Ex. 29, PageID 247).

### B. Delayed Appeal to the Ohio Supreme Court

On October 24, 2023, Petitioner filed a *pro se* notice of appeal and a motion for leave to file a delayed appeal. (*Id.*, Exs. 30, 31, at PageID 269, 300). Petitioner raised the following two propositions of law:

1. Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

    2. The trial court erred by permitting the introduction of evidence related to Appellant's irrelevant prior bad conduct for the impermissible purpose of attacking his character in violation of the Ohio Rules of Evidence and his rights as guaranteed by the United States and Ohio Constitutions.

(*Id.*, Ex. 33, PageID 303). The Supreme Court of Ohio granted Petitioner's request for a delayed appeal (*id.*, Ex. 32, PageID 302), but declined jurisdiction (*id.*, Ex. 34, PageID 335).

    **C.**    **Rule 26(B) Application to Reopen Direct Appeal**

On November 8, 2023, Petitioner filed a *pro se* Ohio Appellate Rule 26(B) application to reopen his direct appeal. (*Id.*, Ex. 35, at PageID 336). He raised the following three issues:

1. The Appellant was denied his right to a complete defense, due process, fair trial and effective assistance of counsel when the trial counsel failed to investigate and to conduct additional testing of the untested DNA samples which are exculpatory and impeaching, which violated his rights under U.S. Constitution Amendment V, VI, and XIV, and Ohio const. Art I, § 1, § 10 and [§]16.

2. The State prosecutor made a Brady Violation when it purposely failed to seek additional Testing of the Untested DNA samples in an attempt to avoid discovering exculpatory and impeaching evidence favorable to the appellant in violation of his right to due process, fair trial under U.S. Constitution Amendment V, VI, and XIV, and Ohio const. Art I, § 1, § 10 and [§] 16.

3. Ineffective Assistance of Appellate Counsel Where Appellant's Appointed Appellate Counsel, Samuel H. Shamansky (0030772), Failed to Mail the Appellate Court Decision in a Timely Manner. Counsel Mailed the Decision On September 28, 2023, Which he Received on October 3, 2023, Totaling 62-Days After the Decision Had been Rendered.

(*Id.*). On December 19, 2023, the Ohio Court of Appeals denied the application to reopen. (*Id.*, Ex. 37, PageID 387).

Petitioner then appealed to the Ohio Supreme Court, raising the following two issues.

1. Appellant was denied the effective assistance of Appellate counsel where counsel failed to raise on direct appeal ineffective assistance of trial counsel where trial counsel failed to request DNA testing of all samples collected during the investigation of the case.

2. Appellant was denied the effective assistance of Appellate counsel where counsel failed to raise on direct appeal that the prosecutor committed a brady

7

> violation when it avoided testing the untested DNA samples which is material exculpatory and impeaching evidence.

(*Id*., Ex. 39, PageID 400). The Ohio Supreme Court denied further review. (*Id*., Ex. 40, PageID 422).

### D. Federal Habeas Corpus Petition

Petitioner initiated the instant habeas corpus action in July 2024. (Doc. 1). The Petition and later filed Supplemental Amended Petition raise three grounds for relief. (*See* Docs. 1; 8, at PageID 2207). Because the Court denied Petitioner's request to include a duplicative "Ground Three" in the Supplemental Amended Petition (*see* Doc. 10, at PageID 2218), the three grounds for relief before the Court are numbered Grounds One, Two, and Four for the sake of consistency in the record.

> **GROUND ONE**: The Petitioner was denied his right to a complete defense, due process, fair trial and effective assistance of counsel when the trial counsel failed to investigate and to conduct additional testing of the untested DNA samples which are exculpatory and impeaching, which violated his right under U.S. Constitution Amendment V, VI, and XIV, and Ohio Const. Art I, 1, 10 and 16.
>
> **Supporting Facts**: Petitioner[']s counsel was ineffective because he failed to raise trial counsel's failure to request DNA testing of all samples collected during the investigation of the case. Giving that the Y-STR is very broad, and the petitioner[']s claims of innocence trial counsel should have tested the untested sample to discover who the male DNA belonged to where it was not linked to the petitioner.
>
> **GROUND TWO**: The prosecutor committed a *Brady* violation when it purposely avoided testing the untested DNA samples which is material exculpatory and impeaching evidence.
>
> **Supporting Facts**: Prosecutor suppressed favorable [e]vidence in violation of *Brady v. Maryland*. Giving that the Y-STR is very broad, and the petitioners claims of innocence the prosecutor should have tested the untested sample to discover who the male DNA belonged to where it was not linked to the petitioner.
>
> **GROUND FOUR:** Appellant was denied the effective assistance of appellate counsel where counsel failed to raise on direct appeal that the prosecutor committed

8

>a Brady violation when it avoided testing the untested DNA samples which is material exculpatory and impeaching evidence.

(Doc. 1, at PageID 7–8; Doc. 8, at PageID 2207).

Respondent contends that Petitioner's claims of ineffective assistance of trial counsel (part of Ground One) and prosecutorial misconduct (Ground Two) were not raised in the state courts and are now procedurally defaulted and that Petitioner's claims of ineffective assistance of appellate counsel (the remainder of Ground One and Ground Four) are without merit. (Doc. 11, at PageID 2236-50). Because "in order to determine whether cause exists for the [alleged] procedural default of [Petitioner's] ineffective assistance of trial counsel [and prosecutorial misconduct] claim[s], we must, ironically, consider the merits of [those] claim[s]," *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003), the Undersigned elects to overlook the alleged procedural default and address each of the claims on the merits. *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (quoting *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003)) ("'[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits,' especially where the procedural default issue is 'complicated' and 'is unnecessary to [the] disposition of the case.'") (alterations in original). For the reasons below, the Petition, as amended, should be denied.

### III. Analysis

The Court begins by summarizing the legal standard that applies to the Petition before turning to Petitioner's grounds for relief.

#### A. Legal Standard

Review of the Petition, as amended, is governed by the standard set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

9

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599–600 (quoting *Williams*, 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g.*, *Cullen v. Pinholster*, [563] U.S. [170, 181-82], 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*.... This is a "substantially higher threshold."... To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter*, [562] U.S. [86, 98-99], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

10

*Id.* (emphasis in original). The Supreme Court extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams*, 568 U.S. 289, 292 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S. at 102. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 38–40 (2011); *cf. Otte*, 654 F.3d at 600 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). In *Greene*, 565 U.S. at 38, the Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. We said that the provision's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.*, at 182, 131 S.Ct. at 1398. The

11

reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions *as of 'the time the state court renders its decision*.' " *Id.*, at 182, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade*, 538 U.S. [at] 71-72, 123 S.Ct. 1166 . . .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)). The writ may issue only if the application of clearly established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams*, 529 U.S. at 412).

**B.      Ground One Should Be Denied**

In Ground One, Petitioner asserts that trial counsel was ineffective for failing to test all the DNA samples collected by the police during the investigation of the charges against him. Petitioner contends that the untested samples would have been exculpatory and impeaching. Petitioner also faults appellate counsel for not raising this issue on appeal. (Doc. 1, at PageID 7–8).

When, as here, "an ineffective assistance of counsel claim rests on the deficient selection of appellate issues, the primary, if not single, focus of the court is the merit or lack thereof of the unraised issues." *Jaynes v. Mitchell*, No. CA 03-11582, 2015 WL 881245, at *10 (D. Mass. Mar. 2, 2015), *subsequently aff'd*, 824 F.3d 187 (1st Cir. 2016) (quoting *Rosenthal v. O'Brien*, 814 F.Supp.2d 39, 57 (D. Mass. 2011)). As such, denial of the unraised issue "will necessarily lead to denial of the ineffective assistance of appellate counsel claim." *Id.*

The Ohio Court of Appeals reasonably concluded that Petitioner's trial counsel did not render ineffective assistance by failing to test all the DNA samples and, therefore, that his appellate counsel's failure to raise that issue also did not constitute ineffective assistance:

> In the case at bar, Gillard cannot demonstrate a genuine issue that he was deprived of the effective assistance of appellate counsel. Counsel's decision not to request more testing was a "legitimate tactical decision." Gillard was represented by an experienced trial attorney who presumably was aware of the issues involving the evidence of rape. Gillard's retained trial counsel decided not to hire or to request the appointment of a DNA expert, or to request testing of any other piece of evidence, choosing instead to rely on his cross-examination of the state's experts in order to rebut the evidence of rape. In light of these circumstances, the errors alleged by Gillard were neither so serious that his counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, nor so serious that the result of his trial was rendered unreliable. *See, State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987).
>
> \*\*\*
>
> All of the evidence concerning Gillard's claim to having had sex with . . . M.G.'s sister[] was presented to the jury. Gillard's claim that the testing of [M.G.'s sister's] DNA samples would be exculpatory and impeaching, excluding M.G.'s DNA from Gillard's penile swab are entirely speculative. Even if the testing of [M.G.'s sister's] DNA on Gillard's penile swab came back positive or inconclusive, it would not support his assertions. The testing from Gillard's penile swab contained a mixture of DNA so that even if [M.G.'s sister's] DNA was found, it would not exonerate Gillard in the rape of M.G. Also, Y-STR testing from M.G.'s breast and vaginal samples revealed the presence of a male DNA profile from which Gillard could not be identified, but could also not be excluded. Testing of [M.G.'s sister's] DNA would have no effect on this evidence. In other words, proof that Gillard had sex with [M.G.'s sister] does not prove Gillard did not rape M.G.
>
> The jury was aware that the SANE nurse's examination of the victim found nothing abnormal in her examination of the victim. Further, the jury was aware that none of the tested samples revealed the presence of sperm. Moreover, none of the tested samples definitively revealed the presence of Gillard's DNA on M.G. Similarly, M.G.'s DNA could not be excluded from Gillard's penile swab, as it contained a mixture of DNA. At most Y-STR testing from M.G.'s breast and vaginal samples revealed the presence of a male DNA profile from which Gillard could not be identified, but could also not be excluded.
>
> Thus, even without a definitive DNA connection, the jury still concluded that Gillard was guilty based upon the circumstantial evidence, and testimony of the

13

> other witnesses. *See State v. Roberts*, 5th Dist. Guernsey No. 2006-CA-02, 2006-Ohio-5018, ¶56.

(Doc. 4, Ex. 37, PageID 391–394) (state-appellate-court record cites omitted).

The Ohio Court of Appeals' denial of the ineffective-assistance-of-counsel claims raised in Ground One was neither an unreasonable application of, nor contrary to, clearly established Supreme Court case law. The court correctly identified and laid out the two-prong *Strickland v. Washington* test—requiring a defendant to demonstrate that (1) his counsel's performance was deficient, and (2) he was prejudiced as a result—in analyzing Petitioner's Sixth Amendment ineffective assistance of counsel claim. (Doc. 4, Ex. 37, at PageID 388–89) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under the *Strickland* standard, "a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689. Further, to satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The state appellate court reasonably concluded that Petitioner failed to demonstrate deficient performance under the first prong of *Strickland*. Petitioner merely assumes that additional DNA testing would have rendered findings favorable to him. (*See, e.g.*, Doc. 12, at PageID 2258–2260). But it is possible that examination of the untested items, "which included pubic hair, neck, thigh, and fingernail swabs from M.G." (*see id.* at PageID 2258), would not have advanced his case. As noted by the Ohio Court of Appeals, Petitioner could not be excluded from the male DNA found in M.G.'s breast and vaginal samples. Similar results on the untested items

14

would have damaged his defense. (Doc. 4, Ex. 37, PageID 393). Nor would Petitioner's case have been advanced by additional testing showing that Petitioner had sex with M.G.'s sister—such evidence would not have proven that he did not rape M.G. (*Id.*).

Given the speculative nature of Petitioner's contention that additional DNA evidence should have been obtained, trial counsel reasonably opted to instead use the untested evidence as a method to cast doubt on the state's case. Trial counsel highlighted the untested evidence in his opening statement. (*See, e.g.*, Doc. 4-2, at PageID 820 ("One thing that was collected that seemed—seems to me to be very significant in a rape case is they found a pair of woman's underwear on the couch. . . . It was never submitted for examination. Never.")). Counsel also attempted to draw inferences of an incomplete investigation by referring to the untested evidence in his closing argument. (*Id.* at PageID 2082 ("Tests that could have been performed were not performed on evidence—on items that were collected and put into evidence presumably for the purpose of performing these tests. So let's talk for a moment about the tests that could have been but were not performed in this case.")). What is more, although trial counsel did not obtain an expert to analyze the untested samples, counsel did retain a DNA expert. During trial, counsel questioned the expert extensively to showcase perceived weaknesses in the state's case, including those caused by the untested evidence. (*See, e.g.*, *id.* at PageID 1895 ("Q. So they have a way to test for a substance in urine? A. That's correct. Yeah. Q. To your knowledge, was there any test for a substance in urine performed in this case? A. They didn't report any. I didn't see any reports of any testing for that."); at PageID 1928–29 ("Q. To your knowledge was any of M.G.'s clothing, other than her underwear, tested for the presence of [Petitioner's] DNA? A. Not to my knowledge.")). The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002).

15

Similarly, Petitioner has failed to demonstrate prejudice under the second prong of *Strickland*. The speculative nature of Petitioner's theory, as well as the corroborating evidence of his guilt, prevents him from showing that a "'reasonable probability' exists that, but for counsel's alleged error, the result of the trial would have been different." *Gerald v. Warden, Ross Corr. Inst.*, No. 1:15-CV-493, 2017 WL 2303672, at *30 (S.D. Ohio Feb. 27, 2017) (quoting *Strickland*, 466 U.S. at 694), *report and recommendation adopted*, 2017 WL 2289498 (S.D. Ohio May 25, 2017). To start with, M.G. testified that Petitioner raped her. (Doc. 4-2, at PageID 1524–1532; 1539–48). Her testimony was clear and consistent with statements she made at the hospital following the incident. (*Id.* at 1130–35). Next, the abrasion on her back (*id.* at PageID 1072; 1169) was consistent with her testimony, as was her distressed demeanor upon her return home, as testified to by her friend and her mother (*id.* at PageID 1068–69; 982–83; 986–87). Testimony was also offered by the S.A.N.E. nurse (*id.* at PageID 1156) that M.G.'s normal vaginal exam following the rape was expected, given her age and development at the time (*id.* at PageID 1184–85).

Without a showing of deficient performance and prejudice, Petitioner's claim of ineffective assistance of trial counsel fails. *Strickland*, 466 U.S. at 687. And because appellate counsel is not ineffective for not raising meritless claims, *see Willis*, 351 F.3d at 746, Petitioner's ineffective assistance of appellate counsel claims also fails. Accordingly, Ground One should be denied.

**C.    Grounds Two and Four Should Be Denied**

In Ground Two, Petitioner asserts that the prosecutor's decision to leave certain evidence untested violated the rule announced in *Brady v. Maryland*, 373 U.S. 83 (1963). In Ground Four, Petitioner asserts that appellate counsel was ineffective in not raising this issue on appeal. (Doc. 1, at PageID 8; Doc. 8, at PageID 2207).

As with the claims in Ground One, the Ohio Court of Appeals considered the *Brady* and ineffective assistance of appellate counsel claims presented in Grounds Two and Four during the Rule 26(B) proceedings. In denying the claims, the court reasoned:

> In his Second proposed Assignment of Error, Gillard contends the state committed a *Brady* violation when it purposely avoided testing the untested DNA samples which is material exculpatory and impeaching evidence. Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), the state violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. *Matter of P.K.*, 5th Dist. Guernsey No. 19 CA 08, 2019-Ohio-2311, 2019 WL 2451050, ¶ 11 *citing Brady*, 373 U.S. 83, 87, 83 S .Ct. 1194, 10 L.Ed.2d 215. The Supreme Court has explained, "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009).
>
> In the case at bar, the forensic test results and DNA test results were disclosed to the defense. *Brady* clearly does not impose an affirmative duty upon the government to act to discover information which it does not possess. *United States v. Graham*, 484 F .3d 413, 417 (6th Cir. 2007) *citing United States v. Beaver*, 527 F .2d 963, 966 (5th Cir. 1975). The sum total of the information known to the government regarding the DNA testing, items collected as evidence and forensic testing was in the reports which were furnished to Gillard. The government presented no additional or conflicting evidence at trial, and the defense had an opportunity to, and did, cross-examine the witnesses regarding the points of the testing, test results, lack of testing and lack of test results. In other words, there was no undisclosed evidence in Gillard's case. Therefore, Gillard can demonstrate no *Brady* violation. We find that the issues raised by Gillard in his second proposed assignment of error raise "no genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal***" *State v. Smith*, 95 Ohio St.3d 127, 2002-Ohio-1753; *State v. Leyh*, ¶ 21, *citing State v. Spivey*, 84 Ohio St.3d 24, 25, 701 N.E.2d 696 (1998).

(Doc. 4, Exhibit 37, at PageID 387).

The Ohio Court of Appeals' decision was neither an unreasonable application of, nor contrary to, clearly established Supreme Court case law. To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the suppressed evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective

17

of the good faith or bad faith of the prosecution." *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Brady*, 373 U.S. at 87; *Bowling v. Parker*, 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd*, 344 F.3d 487 (6th Cir. 2003). Evidence "favorable to the accused" includes both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682; *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Petitioner has not identified any suppressed *Brady* evidence in his case. Indeed, "[u]nlike *Brady* evidence, untested DNA evidence is not always exculpatory." *Walker v. Williams*, No. CV 14-6586, 2015 WL 4931794, at *3 (E.D. Pa. Aug. 17, 2015) (citing cases). *See also Mitchell v. Pierce*, No. CV 15-244, 2016 WL 1446131, at *5 (D. Del. Apr. 11, 2016) ("[U]ntested . . . evidence did not constitute 'suppressed' evidence for *Brady* purposes."). Nor has Petitioner established a duty on the prosecutor to test each collected item. "*Brady* prohibits the government from suppressing evidence favorable to the accused, but it does not require the government to gather evidence for the defense, especially when the defense knows about the evidence, makes no request for the evidence, and has equal access to the evidence." *United States v. Dossey*, 66 F. App'x 528, 530 (6th Cir. 2003). *See also United States v. Alverio-Melendez*, 640 F.3d 412, 424 (1st Cir. 2011) ("[B]ecause no fingerprint analysis report existed, the government did not commit a Brady violation in failing to turn over such a report. The failure to create exculpatory evidence does not constitute a Brady violation.") (citing cases); *Batchilly v. Nance*, No. 08 Civ. 7150, 2010 WL 1253921, at *34 (S.D.N.Y. Apr. 2, 2010) (finding no *Brady* violation where the prosecution failed

18

to conduct further DNA testing of bite mark) (citing cases), *report and recommendation adopted*, 2011 WL 1226260 (S.D.N.Y. Mar. 30, 2011).

Because Petitioner has failed to establish a *Brady* violation, counsel could not be ineffective for failing to argue one on appeal. *See Willis*, 351 F.3d at 746. Accordingly, Grounds Two and Four should be denied.

### D. Petitioner's Request for Evidentiary Hearing Should Be Denied

Finally, Petitioner seeks an evidentiary hearing "on all claims, especially all ineffective assistance of counsel claims." (Doc. 12, at PageID 2268). However, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. Because the state court of appeals decided the ineffective assistance of appellate claims on the merits in the Rule 26(B) proceedings and, in so doing, necessarily considered the merits of the underlying ineffective assistance of trial counsel and prosecutorial misconduct claims, *see Willis*, 351 F.3d at 745, this Court is limited to considering the record upon which the state court made its decision. Accordingly, an evidentiary hearing in this case is barred. *Pinholster*, *supra*. The Motion for evidentiary hearing should therefore be denied.

### IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's Petition, as amended, for a writ of habeas corpus (Docs. 1; 8, at PageID 2207) be **DENIED with prejudice.**

2. Petitioner's request for an evidentiary hearing (Doc. 12, at PageID 2268) be **DENIED**.

3. A certificate of appealability should not issue with respect to the claims alleged in the Petition, as amended, because Petitioner has not stated a "viable claim of the denial of a constitutional right," nor are the issues presented "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S.

19

880, 893 & n.4 (1983)).  *See also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

4.  The Court certify pursuant to 28 U.S.C. § 1915(a)(3) that with respect to any application by Petitioner to proceed on appeal *in forma pauperis,* an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** Petitioner leave to appeal *in forma pauperis.*  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

Date: September 5, 2025                                         s/ Kimberly A. Jolson
                                                                KIMBERLY A. JOLSON
                                                                UNITED STATES MAGISTRATE JUDGE

### PROCEDURE ON OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).